583 A.2d 50

**PENNSYLVANIA STATE POLICE, Petitioner,**

**v.**

**COMMONWEALTH of Pennsylvania, PENNSYLVANIA HUMAN RELATIONS COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Sept. 11, 1990.

Decided Nov. 29, 1990.

382

Joseph S. Rengert, Chief Counsel, Harrisburg, for petitioner.

Francine Ostrovsky, Asst. Chief Counsel, with her, Elisabeth S. Shuster, Chief Counsel, Harrisburg, Pa., for respondent.

Before COLINS and PELLEGRINI, JJ., and NARICK, Senior Judge.

NARICK, Senior Judge.

The Petitioner, the Pennsylvania State Police, appeals an order of the Pennsylvania Human Relations Commission (Commission) for a fourth time.[1] At last, the merits of the case are squarely before us. The Commission found that the Petitioner had unlawfully discriminated against Almando Carrasquillo on the basis of his Puerto Rican ancestry. It ordered Petitioner to reinstate Carrasquillo, with backpay, to his position as a Pennsylvania State Trooper. We affirm.

In *PSP II*, we set forth an extensive explanation of the factual background of this case, which will not be repeated

---

1. In *Pennsylvania State Police v. Pennsylvania Human Relations Commission*, 99 Pa.Commonwealth Ct. 361, 512 A.2d 1355 (1986) (*PSP I*), this Court remanded with directions that all members of the Commission review the entire record before voting on whether or not to uphold its Hearing Commissioners' findings. A second remand was ordered in *Pennsylvania State Police v. Pennsylvania Human Relations Commission*, 116 Pa.Commonwealth Ct. 89, 542 A.2d 595 (1988) (*PSP II*) for the Commission to reconsider its order in light of the Supreme Court's clarifications with respect to the applicable burdens of proof in discrimination cases as expressed in *Allegheny Housing v. Human Relations Commission*, 516 Pa. 124, 532 A.2d 315 (1987). A third remand was necessitated due to the Commission members' expressed confusion regarding the scope of their fact-finding powers in *Pennsylvania State Police v. Pennsylvania Human Relations Commission*, 127 Pa.Commonwealth Ct. 436, 561 A.2d 1320 (1989) (*PSP III*).

here.[2] Rather, for the sake of convenience, we will briefly summarize the Commission's findings, with emphasis upon those to which the Petitioner objects.

In May 1981, Almando Carrasquillo, a bilingual male of Puerto Rican descent, entered the State Police Academy, where he completed five months of training. Following his graduation, he received a three-day suspension for failing to respond truthfully to an incident involving his academy roommate. He was thereafter assigned to interstate highway patrol duty at Troop S in Harrisburg, where he successfully completed a thirty-day "coach-pupil" training program under Trooper Brenner.

State troopers are required to serve an eighteen-month probationary period, during which they may be discharged following a fairly informal hearing process; after the probationary period, a formal court martial is necessary.

During Carrasquillo's tenure as a probationary trooper, he was "counseled" in January and June 1982 for various rule and policy violations. These included infractions such as improper radio demeanor (use of "smart-alecky" tone), playing pinball while in uniform, use of coarse language over troop car P.A. system, lack of military courtesy, and failure to comply with various procedural reporting requirements. In addition to being counseled for the latter infractions, Petitioner received increasing numbers of "discrepancy notices," or forms used by supervising corporals to indicate errors in filling out reports.

In March of 1982, Carrasquillo received his first performance evaluation, in which he was rated "good" overall. However, in July 1982, Corporal Lanier completed a general performance evaluation for Carrasquillo, in which he recommended non-retention. He cited Carrasquillo's inability to perform routine duties without supervision and his belief that Carrasquillo's work habits were not in keeping with his

**2.** The Commission's findings after our remand in *PSP II* remained essentially the same, except for the deletion of reference to the hearsay evidence discussed therein, and with the appropriate modifications necessary for compliance with *Allegheny Housing.*

abilities. During his probationary period, Carrasquillo had been sent out on patrol both alone and with cadets from the Academy whom he was training.

Corporal Lanier's recommendation prompted a request for additional information from Petitioner's personnel department, which suggested the inclusion of statements from Carrasquillo's supervisors, magistrates with whom he had dealt and members of the public. An additional report was submitted which, the Commission found, added little new information. A hearing was scheduled before the three-member Probationary Trooper Review Committee, two members of which voted in November 1983 to discharge Carrasquillo.

Following its hearings on Carrasquillo's complaint of unlawful discrimination, the Commission found that Carrasquillo made out a *prima facie* case of discrimination and that, while the Petitioner had articulated a legitimate, non-discriminatory motive for his discharge, the articulated reasons were a pretext. It concluded that Petitioner had discriminated against Carrasquillo on the basis of his Puerto Rican ancestry.

On appeal to this Court, Petitioner raises five issues, which may be consolidated into two general allegations of error. Petitioner first argues that the Commission's findings are not supported by the evidence. Its second argument is that the Commission erred as a matter of law in its allocation of the parties' respective burdens of proof.

■ Our scope of review, of course, is limited to a determination of whether constitutional rights have been violated, whether necessary findings of fact are supported by substantial competent evidence or whether the Commission has made an error of law. *PSP II.* Since the bulk of Petitioner's arguments on appeal concern factual issues, we find it useful to emphasize that "the Commission is the sole judge of the credibility of witnesses and it decides what evidence should be accepted as fact, what weight should be given to the evidence, and what inferences are to be drawn

from the evidence." *Pittsburgh Board of Public Education v. Pennsylvania Human Relations Commission,* 128 Pa.Commonwealth Ct. 324, 328 n. 4, 563 A.2d 581, 583 n. 4 (1989) (citation omitted).

█ Petitioner offers several bases for its argument that the Commission's finding of pretext is not supported by substantial evidence. It first asserts that the Commission erred in comparing Carrasquillo's treatment to that of dissimilar individuals. For example, it cites an incident referred to in the Commission's opinion in which Carrasquillo and his partner, Trooper Darthinia Hairston, were trying to locate an accident off the interstate. Carrasquillo was later counseled for poor radio demeanor in responding to the questions regarding the location of their vehicle. Petitioner vigorously argues that it was error for the Commission to have relied upon its failure to counsel Hairston as evidence of pretext, since she was not in radio communication with the barracks. The Commission's focus, however, was not upon the charge of poor radio demeanor, but upon the strong insinuation that Carrasquillo had intentionally lied about the location of the vehicle. The Commission found it significant that there was never a question as to whether the mistake in location may have been attributable to Hairston.

Petitioner next argues that the Commission erred in finding pretext based upon evidence of the "case" built against Carrasquillo in bringing him before the Trooper Review Committee. The Commission looked at the general investigation reports of other probationary troopers who had been recommended for non-retention by their superiors. It found that the report on Carrasquillo was the least specific, recommending non-retention based solely on five infractions: unauthorized use of a patrol car for personal relay, coming to work late once, using a vulgar term over the troop car P.A. system, one incident of rudeness to a superior officer and one error in filling out a traffic citation. Further, it noted that just ten days after Corporal Lanier had signed his recommendation, Sergeant Barkofsky signed

an evaluation giving Carrasquillo an overall high "fair" rating. His performance was rated unsatisfactory in only one category, "relationships with people," while the quantity and quality of his work was rated good.

Petitioner argues that the reports of other troopers who were scheduled for a retention hearing cannot be used as evidence of disparate treatment because the Commission is, in fact, comparing individuals who were all treated the same in that all were subjected to a Trooper Review Committee hearing. This argument misses the point of the Commission's findings.

The Commission looked at both the timing of the accusations against Carrasquillo and their content as one factor in its ultimate conclusion that Carrasquillo had been treated differently. For example, events which had occurred well prior to the recommendation of non-retention, which were not enumerated in the original report, were later resuscitated (after a directive from the personnel department to supply additional information) as justification for the recommendation. Little new detail was added in this manner, particularly with respect to Carrasquillo's ability to perform his job.

The Commission also found that the supplemental information gathered was different from that compiled in the comparison cases in that no members of the public who came in contact with Carrasquillo in the performance of his duties were interviewed, and the results of the interviews of magistrates were not individually reported. Rather than summarizing the magistrates' comments, both positive and negative, as appeared to be the usual procedure, Carrasquillo's report merely indicated that none of the magistrates contacted would say anything negative about his performance in court.

Finally, the Commission took note of the highly subjective terms Corporals Lanier and Shovlin used in describing Carrasquillo's unsatisfactory attitude in supplemental memoranda to the general investigation report. In its role as ultimate fact-finder, see PSP III, the Commission opted to

view these subjective criteria with suspicion. As we stated in *Harrisburg School District v. Pennsylvania Human Relations Commission,* 77 Pa.Commonwealth Ct. 594, 603, 466 A.2d 760, 765 (1983), "[t]he use of subjective criteria is not a per se violation of anti-discrimination laws, but courts generally treat employment decisions predicated on subjective appraisals with particular suspicion."

Petitioner next argues that the Commission erred in referring to incidents that were unrelated to the reasons for Carrasquillo's discharge as support for its finding of pretext. Specifically, it points to two incidents: the fact that Carrasquillo was counseled for playing pinball while in uniform, while the non-Puerto Rican trooper playing with him was not; and the fact that Carrasquillo was sent out with cadets. Petitioner vehemently argues that the Commission may only refer to the reasons an employer cites for discharge of an employee since other incidents are irrelevant to the action which is alleged to be discriminatory.

The problem with this argument underlies all of Petitioner's arguments with respect to whether substantial evidence exists to support the Commission's finding of pretext. Petitioner appears to assume that direct evidence of pretext is necessary. It fails to appreciate that the Commission's task is rarely so simple. Its factual findings will usually be based upon the inferences it chooses to draw from the testimony. To allow an employer to define the parameters of the Commission's inquiry by limiting it to the employer's expressed reasons for discharge would be to eliminate the Commission's power to consider incidents which might belie that expressed motive. As a practical matter, pretext is likely to be found only inferentially, as an employer with a discriminatory motive would be quite unlikely to document such motive. Our Supreme Court recognized this over two decades ago, when it observed: " 'One intent on violating the Law Against Discrimination cannot be expected to declare or announce his purpose.' " *Pennsylvania Human Relations Commission v. Chester School District,* 427 Pa. 157, 172, 233 A.2d 290, 298 (1967) (quoting *Holland v.*

*Edwards,* 307 N.Y. 38, 45, 119 N.E.2d 581, 584 (1954)). *See also Harrisburg School District.*

Addressing Petitioner's particular complaints, we see no error in the Commission's reliance on the pinball incident. While Petitioner argues that the fact that another trooper was with Carrasquillo was not discovered until months later, the Commission apparently attached significance to the fact that the second trooper was never counseled. This, of course, contrasts with the treatment of Carrasquillo, especially throughout the period following the recommendation of non-retention, when previously undiscovered or unreported incidents became reported.

Petitioner argues that it was "irrelevant" that Carrasquillo was sent out to train cadets, since the problems for which he was discharged involved his lack of concern for complying with the reporting system and his lack of respect for the supervisory role. If indeed these were the reasons for his discharge, it is unexplained why Petitioner would deem it fruitful to have Carrasquillo instill these bad habits in cadets. In citing these training incidents in its opinion, the Commission was struck by the fact that Corporal Lanier wrote in his general investigation report that Carrasquillo was incapable of performing his job without supervision. Such a difference between an employer's actions and words certainly may give rise to an inference of pretext, and it is not our task to second guess the fact-finder. *Pittsburgh Board of Public Education; PSP II.*

Petitioner next argues that there was no evidence to support the Commission's finding that Corporal Lanier's initial general investigation report was "inadequate." Petitioner asserts that its adequacy was demonstrated by the fact that a hearing was scheduled on the recommendation. As the Commission points out in its brief, the record indicates that such hearings were scheduled routinely. The finding of inadequacy was addressed to the contents of the report, which we have already discussed above.

Petitioner submits that it was error for the Commission to substitute its judgment for that of the employer, particu-

larly with respect to the seriousness of the offenses involved. In support of its argument, it cites *Slippery Rock State College v. Pennsylvania Human Relations Commission*, 11 Pa.Commonwealth Ct. 501, 314 A.2d 344 (1974). *Slippery Rock* is a case which was decided prior to the definitive Supreme Court opinion in *General Electric Corp. v. Pennsylvania Human Relations Commission*, 469 Pa. 292, 365 A.2d 649 (1976), adopting the analytical framework we continue to employ today. To the extent its holding remains viable,[3] *Slippery Rock* is factually distinguishable. The complainant in that case was discharged for failure to obtain a graduate degree, clearly an objective criterion, and we recognized an employer's right to condition employment upon such a criterion. Here, subjective criteria formed the bulk of the criticism regarding Carrasquillo's job performance. As noted above, it is within the Commission's powers to regard such criteria with suspicion. *General Electric; Harrisburg School District.* Rather than a substitution of judgment, the Commission's findings were based upon its determination that the proffered reasons for dismissal were pretextual.

■ Petitioner's final argument is a legal one: it contends that the Commission erred as a matter of law in placing the burden of persuasion upon it.

The applicable burdens were discussed at length in *PSP II* and were the basis for our second remand. The parties are in agreement that *Allegheny Housing* controls. *Allegheny Housing*, of course, requires that the complainant in a discrimination case make out a *prima facie* case, in order to eliminate the most common non-discriminatory reasons for an employer's action. Absent a response from the employer, a presumption of discrimination arises. If, however, the employer does offer legitimate, non-discriminatory reasons for its action, as we held Petitioner did in *PSP II*,

---

3. It appears that the likely analysis under *General Electric* would have been a conclusion that the complainant in *Slippery Rock* did not make out a *prima facie* case in that she could not establish that she was qualified for the position she sought. Hence, while the reasoning would likely be quite different under *General Electric*, the result appears to be the same.

the presumption of discrimination drops from the case. The Commission must then evaluate the entire body of evidence produced in accordance with the preponderance standard in order to determine " 'which party's explanation of the employer's motivation it believes.' " *Allegheny Housing*, 516 Pa. at 131, 532 A.2d at 319 (citation omitted). The Commission was careful to clarify in *Allegheny Housing* that the burden which shifts to an employer after the complainant has established a *prima facie* case is one of production. The ultimate burden of persuasion rests at all times with the party asserting the wrongdoing, the complainant. Petitioner argues that the Commission erroneously shifted the burden of persuasion to it, based upon the Commission's failure to specifically find that the reasons Petitioner offered were fabricated.

From our review of the Commission's lengthy decision, we are unable to agree with Petitioner's characterization of the Commission's findings. Petitioner has extracted one key sentence from the Commission's opinion as the crux of its argument. The Commission stated that it was "not persuaded" that the actual reason for Carrasquillo's termination was his poor attitude. Commission opinion, p. 17. Viewed in the context of the entire decision, we do not believe the Commission in fact held the Petitioner to a more stringent burden of proof than that specified in *Allegheny Housing*. The Commission went on to state:

> Although the Respondent articulated a legitimate, nondiscriminatory reason for the Complainant's termination, we find that the Complainant has established by a preponderance of the evidence that the reasons given by the Respondent are pretextual. *We choose to believe the Complainant's evidence* which explains the Respondent's action in terminating the Complainant as disparate and unlawfully discriminatory in violation of Section 5(a) of [the Pennsylvania Human Relations Act, Act of October 27, 1955, P.L. 74, *as amended*, 43 P.S. § 955(a) ].

Commission opinion, p. 19 (emphasis added).

■ Petitioner's argument that the Commission was required to find its evidence unworthy of belief in order to

find discrimination in this case is similarly without merit. To so hold would be tantamount to a determination that an employer is entitled to a presumption of non-discrimination once it articulates a legitimate, non-discriminatory motive for a discharge. *Allegheny Housing* makes it clear that the function of evidence of such a motive is simply to rebut the presumption of discrimination which arises from a complainant's *prima facie* case. That accomplished, it is the Commission's task to weigh all of the evidence.

As a practical matter, the weighing of evidence requires the sort of credibility determination Petitioner argues should have been made in this case. Our review of the Commission's opinion convinces us that the Commission did just that. As set forth above, the Commission expressly stated that it chose to believe Carrasquillo's evidence. The corollary to that statement, albeit unexpressed in the opinion, is that the Commission did not accept Petitioner's evidence. Further support for this conclusion may be found in the very language of which Petitioner complains, that the Commission was not "persuaded" by its explanations. "Persuade" is defined in Webster's Third New International Dictionary 1687 (1966) as:

> to induce by argument, entreaty, or expostulation into some mental position (as a determination, decision, conclusion, *belief*): win over by an appeal to one's reason or feelings (as into doing or *believing* something): bring (oneself or another) to *belief*, certainty or conviction.... (Emphasis added.)

Since "we are not persuaded" may be said to be synonymous with "we do not believe," we must reject Petitioner's contention that the Commission was precluded from reaching its conclusion for failure to resolve the credibility issues contrary to Petitioner's position.

In conclusion, our scope of review requires us to defer to the fact-finder concerning matters of evidentiary weight, credibility and the inferences to be drawn from the evidence. *Pittsburgh Board of Public Education.* We have carefully reviewed this voluminous record and must con-

clude that there is substantial evidence contained therein to support the Commission's findings of fact. Further, our review of the Commission's decision convinces us that the Commission did not erroneously shift the burden of persuasion to Petitioner. Rather, it followed the analytical framework originally adopted by our Supreme Court in *General Electric,* as clarified by *Allegheny Housing.*

For these reasons, we shall affirm the Commission's order.

## ORDER

AND NOW, this 29th day of November, 1990, the order of the Pennsylvania Human Relations Commission in the above-captioned matter is hereby affirmed.